## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

_____

WALTER D. WICK,                              :
                                             :
            Plaintiff and                    :
            Counterclaim Defendant,          :
                                             :
        v.                                   :
                                             :
MARK SCHOLS,                                 :        CIVIL ACTION NO. 08-CV-180-JL
            Defendant and                    :
            Counterclaim Plaintiff,          :
        v.                                   :
                                             :
AUTOFAIR INVESTORS, L.P.,                    :
                                             :
            Counterclaim Defendant.          :
_____:

### MOTION TO COMPEL DEPOSITION OF ATTORNEY HENRY E. KINSER

NOW COME the Plaintiff Walter D. Wick ("Mr. Wick") and the Counterclaim

Defendant AutoFair Investors, L.P. (the "Partnership") and pursuant to Federal Rules of Civil

Procedure 30 and 37; the April 13, 2009 Order of this Court; and the Stipulation entered into

between the parties on or about May 19, 2009, respectfully move for an Order permitting them to

conduct the deposition of Attorney Henry E. Kinser, of the Wyatt, Tarrant & Combs, LLP firm

in Lexington, Kentucky, and in support thereof state as follows:

1.      Mr. Wick and the Partnership previously sought to depose Henry E. Kinser,

Schols' trial counsel, with respect to factual issues that go to the heart of the case. Schols

requested a protective order and, on April 13, 2009, the Court conducted a conference in

chambers during which Mr. Wick and the Partnership agreed to defer the request to depose Mr.

Kinser in the hopes that additional discovery would render the deposition unnecessary.

Unfortunately, however, additional discovery which has taken place since April 13, 2009 has only underscored the need for Mr. Kinser's deposition.

2.    The central issue in this case is whether or not a valuation of AutoFair Investors, L.P. (the "Partnership"), issued by the firm of Crowe Horwath LLP, formerly known as Crowe Chizek & Co. ("Crowe"), is "final, binding and conclusive" within the meaning of the buy-sell provision in Schols' Employment Agreement dated June 30, 2006. Mr. Wick contends that the valuation contains numerous errors on its face, that it overstates the value of the Partnership by as much as $30,000,000, and that Crowe's valuation opinion thus cannot stand.[1]

3.    Other critical issues include Schols' claim that he was improperly "excluded" from the appraisal process prior to the issuance of the appraiser's final opinion of value. *See* Defendant's Amended Counterclaims at ¶¶ 21, 24, 40, 41, 54, 55 (alleging that Schols was "excluded" from the appraisal process and that the process was "controlled" by Mr. Wick). Mr. Wick denies these allegations. He contends that not only was Schols allowed to participate fully in the process, but in fact he went beyond the bounds of allowable participation, intimidating Crowe through threats of litigation and making repeated demands upon Crowe that it include certain information in its report, that it exclude certain other information, and that it not attempt to perform a calculation of the amounts to be paid to Schols under the buy-sell provision. *See* AutoFair Investor, L.P.'s Reply to Counterclaims at ¶¶ 66-83; Mr. Wick's Amended and Supplemental Complaint at ¶¶ 41, 42, 51-61 (alleging that Schols exerted improper influence over Crowe during the appraisal process).

4.    It is not disputed that Schols communicated with Crowe primarily through his litigation lawyer, Mr. Kinser. Together with Schols, Mr. Kinser conducted a five-and-a-half hour

---

[1] Although Mr. Wick has not yet elected a remedy for this gross overvaluation, in all likelihood he will ask the Court to direct that a new appraisal process be undertaken.

meeting with Crowe on July 11, 2008.[2] Mr. Kinser also engaged in various other communications with Crowe throughout the appraisal process, including at least four letters, several emails and a lengthy telephone call on October 2, 2008, part -- but not all -- of which he caused to be stenographically recorded and transcribed. These communications, in which the word "litigation" was used repeatedly by Mr. Kinser, have been described by Crowe officials in deposition testimony as "harsh" and "unusual." In addition, in an email finally produced by Crowe earlier this month (in response to a subpoena *duces tecum* served in early March 2009), a senior Crowe official commented to Peter Gampel, the Crowe executive in charge of the appraisal, that "Henry Kinser is 'taking you to the woodshed.'" *See* September 29, 2008 email exchange between Peter Gampel and William Wilhelm.[3]

5.    Given that the appraisal process is at the crux of the various allegations of the parties to this case, given the indisputable and extensive involvement of Mr. Kinser in this process, and given the evidence that his involvement influenced the outcome of that process -- which of course is exactly what he intended to do -- Mr. Wick respectfully submits that Mr. Kinser has unique and discoverable knowledge with respect to the issues to be tried.

**Mr. Kinser Has Unique Knowledge Regarding Schols' "Exclusion", "Control" and "Finality" Claims**

6.    As noted, Schols seeks relief from the Court based on the contention that he was "excluded" from the appraisal process. Mr. Kinser's efforts to obtain information from Crowe, or otherwise to participate in the appraisal process during the period July 2, 2008 through October

---

[2] During his deposition, Mr. Schols was unable to recall making certain representations reflected in the notes taken by Crowe of the July 11, 2008 meeting and was also unable to recollect whether Crowe's notes, which stated that Mr. Kinser believed AutoFair had obtained a letter of intent for its Chevrolet store, were accurate. Moreover, it appears that Mr. Schols forwarded certain confidential AutoFair documents to Mr. Kinser, but was not aware that Mr. Kinser was going to give these documents to Crowe.

[3] In the interest of brevity, Mr. Wick and the Partnership are not including any document or exhibit cited in this Motion which is already on file with the Court in connection with other pending motions. If necessary, however, such documents or exhibits are available for filing.

14, 2008, are therefore highly relevant. Similarly, the extent to which Mr. Kinser successfully persuaded Crowe either to consider information or to exclude information from consideration will be critical to the determination of the claim that Mr. Wick "controlled" Crowe during the appraisal process.

7.      The written evidence of Schols' communications with Crowe begins with Mr. Kinser's letter of July 2, 2008 (in which he introduces himself to Crowe as litigation counsel for Schols and requests a meeting); continues with notes of the five-and-a-half hour meeting on July 11, 2008;[4] and culminates with a series of letters and a partially-recorded phone call in September and October 2008.  Emails have also been produced, and the depositions of all of the individuals with direct knowledge of Mr. Kinser's involvement have now been taken. This evidence suggests that other than attending the July 11 meeting, all communications on behalf of Schols were made by Mr. Kinser. It also demonstrates that Schols did not vigorously attempt, either directly or through Mr. Kinser as his representative, to obtain information from Crowe about the appraisal process. Instead, it appears that almost all of Schols' efforts were designed to influence the outcome of the appraisal. For example, the meeting notes from July 11, 2008 show that for five-and-a-half hours Schols and Mr. Kinser made numerous arguments and factual representations, but do not reflect any demands that information be provided. There also is no evidence that indicates Crowe was ever asked by Mr. Wick or any of his representatives to refrain from cooperating with Schols or with Mr. Kinser, yet Schols persists in his claim that he was denied access to information, so learning what Mr. Kinser has to say about this is critical.

---

[4] The only notes identified thus far are notes taken by Lawrence Martin, a Crowe accountant who attended the meeting. Schols has claimed in discovery responses that neither he nor Mr. Kinser took any notes during the five-and-a-half hour meeting, a claim which has been contradicted by at least one other witness. The possibility that additional written evidence exists is certainly an issue to be explored with Mr. Kinser, particularly given the inconsistent testimony of other witnesses and the fact that it would be highly unusual for an attorney to attend a five-and-a-half hour meeting and take no notes whatsoever.

8.      Mr. Kinser also possesses unique knowledge which is critical to Schols' claim that the July 25, 2008 valuation opinion was "final."  On September 15, 2008, Mr. Kinser wrote to Crowe to "make clear that" there could be "no change or modification [to Crowe's July 25 opinion] absent the manifest error standard." On September 29, 2008, Crowe sent Mr. Kinser a detailed explanation of the modifications to the July 25 opinion which it intended to include in a new report. *See* email dated September 29, 2008 from Gampel to Kinser and Schols (Gampel Depo. Exhibit  No. 53). On October 2, 2008, after reviewing this explanation, Mr. Kinser had a telephone call with Crowe officials Gampel and Kotzen. He stenographically recorded the first portion of the call, and the transcript reveals that he sought unsuccessfully to have the Crowe officials state on the record that Mr. Kinser had not done anything out of the ordinary in his communications with them, at which point they went "off the record." *See* Transcript of October 2, 2008 telephone call. No notes have been produced of the portion of this phone call which was not recorded, and so it remains unclear what was discussed. Following the phone call, however, Mr. Kinser wrote yet another letter to Crowe, dated October 7, 2008. In this letter, Mr. Kinser no longer asserted (as he had in previous letters) that the July 25, 2008 Report was a final report within the meaning of the parties' contract. To the contrary, he demanded that Crowe consider new factual representations and that it change its report.

9.      Despite all of this evidence, Schols has continued to claim, and still claims, that he was excluded from the appraisal process and he also still claims that as a matter of law the July 25, 2008 Report was "final" within the meaning of the contract.  *See, e.g.,* Schols' May 19, 2009 Reply to Supplemental Memorandum. At the same time, he now appears to agree that the October 14, 2008 version of the report does not contain any manifest error. *See* Schols' Answers to Interrogatories executed on February 24, 2009, at No. 4 (claiming inability to identify manifest

error) and March 29, 2009 Report of Kenneth Rosenfield, Schols' purported expert (claiming the October 14, 2008 Report does not contain manifest error). Particularly since Schols has taken confusing and inconsistent positions on the "exclusion," "control" and "finality" issues, Mr. Kinser's testimony is needed to understand exactly what he discussed with Crowe with respect to these issues, exactly what Crowe may have said in response, and what changes to the valuation opinion were made or were not made at his insistence.

10.    It also is significant that in his October 7, 2008 letter to Crowe, Mr. Kinser wrote that Schols "questions the $28 million plus which was shown [in the Crowe report] as indebtedness to related entities" and asserts that "we do not have the documentation to determine the validity of the indebtedness or the entities to which it relates." Yet, when Schols filed his proposed Amended Counterclaims on October 16, 2008 -- before any documents had been produced to him by Mr. Wick in discovery -- he did not identify this intra-company debt as an issue, so he must have received sufficient documentation or other information during the period October 8 through October 15 which caused him to no longer question this very large accounting issue. Mr. Kinser's testimony is necessary to understand why Schols dropped his claim that Crowe had made a mistake with respect to a $28,000,000 item only nine days after Mr. Kinser told Crowe on October 7, 2008 that he had insufficient information about this issue.

11.    The above are typical, but by no means exclusive, examples showing that Mr. Kinser has detailed and unique knowledge of facts which go to the core issues being pressed by Schols herein.

**Mr. Kinser's Testimony Is Needed With Respect To Mr. Wick's "Interference" Claim**

12.    As noted, Mr. Wick contends that Schols interfered with Crowe during the appraisal process and that this was a breach of the buy-sell provision of the Employment

Agreement. The evidence of interference consists primarily of the conduct of Schols' litigation counsel, who "[took Crowe] to the woodshed" when he did not like the conclusions Crowe intended to include in its report.

13.     The impact of the pressure exerted by Mr. Kinser on behalf of Schols was dramatic and is explained in the Supplemental Expert Reports of Catherine Parente, submitted as Exhibits A and B herewith. Most notably, as of June 18, 2008 -- before being contacted by Mr. Kinser -- Crowe professionals had spent 119 hours working on the valuation of the Partnership. Using the same valuation methods ultimately incorporated into the final Crowe report, Crowe had arrived at a preliminary conclusion of value of $21,300,000. The data and valuation models utilized to reach this conclusion were internally reviewed by Gampel, the senior valuation professional on the Crowe team, and by others at Crowe, with no material mistakes being identified. What is more, as late as June 30, 2008 another valuation model using something called the "Guideline Public Company Method," which showed a total Partnership valuation of only $14,700,000 was integrated into a draft report. Then, however, on July 2, 2008, Mr. Kinser got involved and introduced himself to Crowe, making it a point to identify himself as Schols' litigation attorney.  This introduction was followed by the July 11, 2008 meeting, which Gampel decided to conduct without allowing Mr. Wick to attend in person or through a representative. Following the July 11 meeting -- and presumably as a direct result thereof -- **Crowe rewrote its report to increase its opinion of value to more than $50,000,000, using the exact same methods that a month earlier had produced the $21,300,000 figure.** As explained in Ms. Parente's Supplemental Reports, in order to achieve this result, Gampel disregarded the advice of Kotzen, the automobile industry expert on the valuation team, and also manipulated the data that he had previously found to be acceptable. As Ms. Parente also explains in her Supplemental

Reports, the rewritten Crowe report stated that Crowe could *not* use the Guideline Public Company Method, which obviously is false; there was no reason not to use this method other than the fact that it produced a valuation figure which would obviously not be acceptable to Schols and his litigation attorney.

14.     Ideally, the bases for these remarkable revisions following the July 11 meeting would have been ascertained through the depositions of the Crowe personnel responsible for making them, but unfortunately these witness were neither forthcoming nor forthright, to put it mildly. In fact, Gampel testified that after the five-and-a-half hour meeting with Schols and Mr. Kinser, there were "no fundamental changes to the report" and that "nothing fundamental would have changed in terms of [Crowe's] approaches, methodologies, or – or anything else for that matter, other than making sure [Crowe had] dotted the Is and crossed the Ts." Among other things, this obviously false testimony makes it impossible for Mr. Wick to rely upon the existing testimony of Crowe's witnesses regarding the influence that Mr. Kinser exerted over the valuation process. Nor would it make sense to ask further questions of Crowe witnesses such as Gampel, Kotzen or Martin; even if the June 4 discovery cut-off date -- which was adopted at Schols' insistence -- were to be extended, there is no reason to think that these witnesses would change their stories. In this regard, both Gampel and Kotzen denied that relevant drafts and emails existed, which was simply not true, and Martin showed an inability to recall even the most basic facts. While there were some other Crowe professionals who played a minor role in the appraisal process, it would be wishful thinking to suggest that they would reveal any more information than their colleagues who obviously were towing the party line.

15.     What is more, the written records of the communications between Crowe and Mr. Kinser are highly selective. As already noted, Mr. Kinser partially recorded a telephone call but

went "off the record" before the discussion turned to the substance of the Crowe report and his demands with respect to the same. As a second example, Crowe's notes of the July 11 meeting purport to reflect what Schols and Mr. Kinser said, yet not even a single written line of text appears anywhere to document what Gampel or Kotzen may have said in response. *See* July 11, 2008 Notes, filed as Exhibit F to Objection to Defendant's Motion for Protective Order.

16.    In short, there is overwhelming circumstantial evidence that demonstrates Mr. Kinser influenced the outcome of the Crowe report. Given the absence of complete or comprehensive documentation regarding the communications between Mr. Kinser and Crowe, and given the unreliability of the Crowe witnesses with respect to these communications and the outcome thereof, Mr. Kinser is a necessary witness for both discovery and trial purposes with respect to this issue.

**The Difficult Standard For Conducting The Deposition Of Opposing Counsel Is Satisfied**

17.    Mr. Wick and the Partnership understand that a request for the deposition (as well as the trial testimony) of counsel of record is extraordinary, and they do not make this request lightly. On the other hand, neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence impose a blanket prohibition on the deposition of an opposing party's attorney, *see Dunkin' Donuts, Inc. v. Mandorico, Inc.*, 181 F.R.D. 208, 209 (D.P.R. 1998), and the fact that a proposed deponent is an attorney for one of the parties is not enough, by itself, to justify the granting of a protective order.  *See Frazier v. Southeastern Pa. Transp. Auth.*, 161 F.R.D. 309, 313 (E.D. Pa. 1995). The work product doctrine also is not an absolute bar to the deposition of opposing counsel. As a general matter, the work product doctrine protects the "mental impressions" of attorneys from discovery by the opposing party where there is no "showing of necessity." *Hickman v. Taylor*, 329 U.S. 495, 508-10 (1947).  But, in recent years, courts have

moved towards a more flexible approach in applying this doctrine to allow the depositions of attorneys who, like Mr. Kinser in this case, are not just trial counsel, but also were deeply involved in the transactions that are the subject of the litigation. *Compare Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327-30 (8th Cir. 1986) (employing a three-part test in determining whether the deposition of defendants' in-house counsel who had nothing to do with the lawsuit except to represent her client was appropriate) *with Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Friedman (In re Friedman)*, 350 F.3d 65, 71-72 (2d Cir. 2003) (rejecting *Shelton* in favor of a more flexible "totality of the circumstances" test). Significantly, courts have pointed out that, when a party employs counsel to represent it in a case in which the attorney has played a role in the underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested. *See, e.g., United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 164 F.R.D. 245, 249 (D. Kan. 1995), *rev'd in part on other grounds*, 205 F.3d 1219 (10th Cir. 2000) (counsel was directly involved in events preceding lawsuit and relevant to issues in dispute, and but for his status as attorney, would be considered appropriate witness); *Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578*, 130 F.R.D. 348, 352 (D.N.J. 1990) (deposition may be both necessary and appropriate if attorney is fact witness such as "actor or viewer," rather than one who was not a party to any underlying transactions giving rise to lawsuit).

18.    Although the First Circuit adopted the *Shelton* test with respect to the *trial* testimony of an attorney, *see Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 66 (1st Cir. 2003), it has not applied this test to pretrial depositions.  *See Carey v. Textron, Inc.*, 224 F.R.D. 530, 531 (D. Mass. 2004).  In fact, in our District, the tendency has been to favor the more flexible approach. While the *Bogosian* factors have been cited, *see In re Tyco Int'l Ltd.*, 2007

U.S. Dist. LEXIS 66930 at * 9-10 (D.N.H. Sept. 7, 2007) (*quoting Bogosian),* the court also cited *Friedman*'s "'flexible' approach to attorney depositions, whereby all the factors set forth in Rule 26 are considered," including the need to depose the lawyer, the lawyer's role in the matter upon which discovery is sought, the risk of privilege and/or work-product issues arising, and the extent of existing discovery, and allowed the deposition of one of the parties' trial attorneys to proceed. *See id*. at *11-13.

19.     In any event, even under the more strict *Shelton* test, Mr. Kinser is an essential witness whose deposition should be allowed.  In determining whether the deposition of opposing trial counsel is prohibited, "the factors to be considered include: 'whether (i) the subpoena was issued primarily for purposes of harassment, (ii) there are other viable means to obtain the same evidence, and (iii) to what extent the information sought is relevant, non-privileged and crucial to the moving party's case.'"  *See In re Tyco Int'l Ltd.*, 2007 U.S. Dist. LEXIS 66930 at * 9-10 (D.N.H. Sept. 7, 2007) (*citing Bogosian*).  As already explained in detail above, the primary purpose in calling Mr. Kinser to give deposition testimony is to lead to the discovery of admissible evidence regarding fundamental issues in this case, *viz.* Mr. Schols' claims of "exclusion", "control" and "finality" as well as Mr. Wick's claim and defense that communications with Mr. Kinser may have improperly influenced representatives at Crowe.  Mr. Wick has tried diligently to obtain all relevant information regarding these issues from other sources, but has not been successful. As explained above, documents recording highly relevant communications do not exist and other witnesses who might have described those communications have not told the truth.  It cannot be seriously disputed that Mr. Kinser's communications with Crowe are relevant, non-privileged and crucial to the issues this case, and under the circumstances he is the only source of relevant knowledge about the remaining facts

which have not been disclosed. Indeed, given that he conducted essentially all communications with Crowe on behalf of Schols, he has unique knowledge of these relevant facts. As such, his deposition is perfectly appropriate. *See Alcon Labs., Inc, v. Pharmacia Corp.*, 225 F. Supp. 2d 340, 343-344 (S.D.N.Y. 2002) (defendant's counsel was "likely the best, and perhaps only," source of information concerning prosecution history and inventorship of patent because that attorney was lead counsel for prosecution of patent, and defendant's choice of that attorney as trial counsel in subsequent cases, with knowledge he was lead prosecuting attorney for patent, could not shield his deposition); *Jennings v. Family Mgmt.*, 201 F.R.D. 272, 279 (D.D.C. 2001) (counsel's dual role as plaintiff's attorney and guardian made counsel "best and perhaps only source" for information regarding plaintiff's state of mind, ability to manage her daily life and financial affairs, and ability to enter into contracts).

WHEREFORE, Mr. Wick and the Partnership respectfully request that an Order be entered:

A.     allowing them to take the deposition of Henry Kinser as a fact witness with respect to the issues of "exclusion", "control" and "finality" raised by Schols and with respect to the issue of interference with the appraisal process raised by Mr. Wick and the Partnership; and

B.     granting them such other and further relief as the Court deems proper.

Respectfully submitted,

**WALTER D. WICK and AUTOFAIR INVESTORS, L.P.**,

By their Attorneys,

**DEVINE, MILLIMET & BRANCH
PROFESSIONAL ASSOCIATION**

Dated: May 26, 2009                     By:      /s/Steven E. Grill
                                                 Steven E. Grill (Bar #7896)
                                                 Anthony S. Augeri (Bar #15817)
                                                 Anne E. Trevethick (Bar #18994)
                                                 111 Amherst Street
                                                 Manchester, NH 03101
                                                 Telephone:  603.669.1000


## CERTIFICATE OF SERVICE

I hereby certify that on this day the foregoing document has been electronically filed with the Court and will be forwarded to counsel of record in accordance with the Court's ECF rules.


Dated: May 26, 2009                              /s/Steven E. Grill
                                                 Steven E. Grill, Esquire